**S. AMANDA MARSHALL,** OSB #953473
United States Attorney
District of Oregon
**HELEN L. COOPER**, OSB #87195
Special Assistant United States Attorney
helen.cooper@usdoj.gov
**UNITED STATES ATTORNEY'S OFFICE**
1000 S.W. Third Ave., Suite 600
Portland, OR   97204-2902
Telephone:   (503) 727-1000
Facsimile:   (503) 727-1117
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Case No: 3:13-cr-44-KI |
| v. | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **PETER CYRIL BYRNE,** | |
| Defendant. | **Sentencing Date:** Tuesday, December 3, 2013; 10:30 a.m. |

The United States of America, by and through S. Amanda Marshall, United States Attorney for the District of Oregon, and Helen L. Cooper, Special Assistant United States Attorney, respectfully submits the following information for the Court's consideration regarding imposition of sentence in the above-captioned matter.   The parties anticipate that defendant will have paid $75,000 towards his restitution by the time of sentencing.   As such, the government agrees with probation's recommendation that a sentence of probation be imposed, with no incarceration, given defendant's age and the unlikely chance he will re-offend.

**Summary of Facts**

In 1990, defendant applied for Supplemental Security Income (SSI), a needs-based, "welfare" benefit, funded by taxpayers and administered by the Social Security Administration (SSA).  Defendant was 65 years-old at the time he applied which is the minimum age for qualifying for SSI aged benefits.   Defendant was approved for benefits in part based on his claim of limited resources, and was advised of his reporting duties and responsibilities which included reporting income and resources, as well as travel outside the United States that lasted more than 30 days.  Between October 1990 and January 2012, defendant received SSI benefits each month with the exception of a three-year time period between February 1993 - March 1996, and a 15-month time period between April 1998 – July 1999.[1]

In December 2011, the SSA Office of the Inspector General (OIG) received a referral from Northwest Senior & Disability Services (NWSDS), that defendant may be concealing both assets and international travel that would make him ineligible to receive SSI, Medicaid, and Supplemental Nutrition Program Benefits (SNAP), also known as "food stamps".   The ensuing investigation quickly determined that defendant was currently outside the United States, had been out of the country for more than 30 days, and, therefore, was not eligible for SSI.  The investigation also determined that defendant's current residence in Pacific City had been purchased by defendant in 2009 with $85,000 in funds transferred from a Barclays of England bank account in defendant's name located outside the United States.  Defendant had transferred

---

[1] SSA determined defendant was not eligible for SSI during these time periods and had been overpaid some SSI benefits due to unreported travel and income.   SSA handled the overpayment administratively by collecting the overpayment from defendant's future SSI benefits when defendant appeared to again be eligible for benefits.

Page 2 - Government's Sentencing Memorandum

the title of the property to his daughter shortly after the purchase. The investigation also determined that defendant was the Executive Director of the International Wildlife Conservation Society (IWCS), which he co-founded in 1968. The IWCS was represented to be a not-for-profit organization created for the purpose of creating a protected park out of part of a big game hunting concession in Nepal operated by defendant from 1953 to 1968. The IWCS website contained newsletters describing defendant's work on behalf of the IWCS since that time, including defendant's regular travels to Nepal, defendant's personal financing of conservation projects, and defendant's development of the White Grass Plains safari lodge in Nepal as a "combination tourist facility and scientific center." The newsletters also encouraged donations to fund defendant's projects and the website contained a link to "PayPal" for the ease of contributing. The investigator subsequently found the safari lodge listed for sale on the internet for $375,000.

In late January 2012, SSA sent defendant a notice advising him that his benefits were being suspended. Shortly thereafter, defendant contacted SSA and inquired why his benefits had been stopped. SSA requested that he come to the SSA office on February 6, 2012, to discuss his eligibility. He was also advised to bring his passport. On February 2, 2012, defendant informed the SSA office that he had "accidentally" sent his passport through the washing machine, and would not be able to bring it with him to the February 6th meeting.

Defendant arrived at the SSA office in Astoria, Oregon, on February 6, 2012, and was asked a series of questions regarding travel, bank accounts, and the purchase of his residence. Defendant denied having any other bank accounts other than the account at Bank of America where his SSI was directly deposited. Defendant denied being outside the United States since 2009 other than one recent trip to Nepal paid for by the IWCS. Defendant further denied

Page 3 - Government's Sentencing Memorandum

purchasing or transferring any real property since 2009, and claimed his residence was owned by his daughter and that he paid her monthly rent.

In April 2012, defendant was contacted by an agent from the SSA OIG. Defendant again maintained that he had only been outside the United States on one occasion since 2009. When defendant was shown Department of State travel records showing multiple trips since 2009, defendant retrieved his personal journal and noted that his journal did in fact show additional travel. Defendant refused to allow the agent to review the journals to confirm his travel, but indicated he would go through the journals and compile a list of his trips outside the United States since 1999 and would contact the agent when that was done.

Defendant also continued to deny that he ever owned the Pacific City residence. When confronted with Tillamook County Assessor records showing his purchase and transfer of the property, defendant maintained that he purchased the property using his daughter's funds and, therefore, never considered himself the owner. He indicated he would provide records supporting this to the agent as well.

Several months elapsed and defendant did not provide the promised records[2]. In July 2012, agents served a search warrant at defendant's Pacific City residence and seized the journals as well as other records. The journals contained detailed entries of defendant's travels including receipts[3], boarding passes, and itineraries.

Investigators also found a copy of defendant's Will which had been executed in May 2012.

---

[2] Defendant had contacted the Federal Public Defender's Office shortly after he was contacted by SSA OIG in April.

[3] One entry for Sunday, January 12, 1997 is alongside a hotel restaurant receipt and reads, "A light lunch at the [Hong Kong] Peninsula hotel: $90!"

Page 4 - Government's Sentencing Memorandum

Attached to the Will was a cover letter dated June 10, 2012, addressed to defendant's girlfriend wherein he explained to her that this Will was to replace his older Will and that,

"I will ask you to keep the Will confidential for several reasons.   One of these is my Social Security people, who, in every form that one fills in, want to know if there is a Will anywhere.   I have told them, always, repeatedly, no.   Why?   Because if they know there is one they may on my passing try and claim against it for my Social Security increment payments (SSI) and also, I am told possibly for my Medicare coverage.   So the Will is not filed or registered anywhere… and as far as they are concerned, does not exist."

The Will also states that the Pacific City property had already been transferred into his daughter's name to "avoid taxation".   As to the disposition of the safari lodge, defendant explains that the lodge is commercial property and not registered as a not-for-profit corporation in Nepal. The Will further directs that the lodge be sold and that his girlfriend and daughter each receive 50% of the net proceeds of the sale.   The Will also contains instructions to the girlfriend as to how to avoid greater taxation in Nepal by not truthfully disclosing to the government the sale price of the lodge.

Also located among defendant's records was a letter dated May 30, 2012, from defendant to the Safari Press.   In this letter defendant directed that any future royalty payments from his books published with Safari Press be sent to his girlfriend in California.[4]

Further investigation determined that in addition to the bank account defendant used for his SSI deposits and the Barclays of England bank account not disclosed to SSA, defendant also owned an account with Wells Fargo that was opened in April 2009.   This account showed substantial deposits and was never disclosed to SSA.

Because defendant was deemed to be eligible for SSI, he automatically became eligible for

---

[4] Defendant had been asked by the OIG in April 2012 whether he received any income from the publication of his books to which he stated he did not.

Page 5 - Government's Sentencing Memorandum

Medicaid.   Between 1991 and January 2012, defendant received $11,904.14 in Medicaid benefits to which he was not entitled.

In May 2008, defendant also applied for and began receiving SNAP (food stamps) benefits through the Oregon Department of Human Services (DHS).   On May 7, 2008, April 3, 2009, November 25, 2010, April 3, 2011, and March 28, 2012[5], defendant stated on his applications that he intended to stay in Oregon, that his only income was SSI benefits, and that he only had one bank account with less than a few hundred dollars.   Defendant did not disclose to DHS his bank accounts with Barclays of England or Wells Fargo.   In fact, on his application dated November 25, 2010, defendant stated he had only $44.31, when in fact the day before he had deposited $2,100 to his concealed Wells Fargo account.   One week later on December 2, 2010, defendant deposited $19,470 into this same account.   Between May 2008 and March 2012 defendant received $8,747.00 in SNAP benefits to which he was not entitled.

Between 1990 and January 2012, defendant received $79,714.30 in Social Security, Medicaid, and SNAP benefits to which he was not entitled.

**Argument**

Defendant's concealment and fraud span more than 20 years.   Defendant was not eligible to receive welfare benefits, yet he made it his pattern and practice to make false statements and conceal information to receive multiple social service benefits.   On two prior occasions defendant's SSI benefits were reduced or suspended by SSA because of his income or travel without any resulting criminal prosecution. Despite these prior incidences with SSA, defendant continued to conceal his travel and resources. Any claim by defendant that he did not understand

---

[5] This date is *after* defendant was contacted by SSA and questioned regarding concealing travel and resources.

Page 6 - Government's Sentencing Memorandum

his reporting responsibilities is not credible.  Defendant's deliberate attempt to conceal his bank accounts and his detailed instructions to keep his Will confidential show defendant completely understood the significance to SSA of this information and the effect it would have on his eligibility for benefits.

Defendant's statement that he has "never received income from the IWCS" (PSR ¶ 73), is equally without merit.  According to IWCS financial records, defendant was frequently given thousands of dollars for his trips to Nepal to spend as he wished.  Defendant appears to claim that because these payments were not wages or salary that they do not count as "income".  Also, the Treasurer of the IWCS (who is also defendant's girlfriend), stated that they have never received cash contributions on behalf of the IWCS, yet defendant's 2007 journal contained a copy of the invitation to the girlfriend's 50th birthday party.  The invitation states that she does not want presents, but  " . . . if you like, there will be a glass jar for you to donate your pocket change to the International Wildlife Conservation Society."  The evidence indicates the IWCS was essentially defendant's piggy-bank, and he was required to report that resource to SSA.

In any event, there appear to be substantial sums defendant failed to disclose to SSA and DHS.   In addition to the $85,000 transferred from defendant's Barclays of England bank account for the purchase of the Pacific City residence, defendant's concealed Wells Fargo bank account shows substantial deposits between April 2009 and February 2012.[6]  On February 6, 2012, (the

---

[6] The account was opened on April 27, 2009, with a deposit of $10,000.  Subsequent deposits include $34,980 on May 20, 2009; $5,000 on November 9, 2009; $4,980 on December 24, 2009; $1,380 on January 5, 2010; $5,000 on January 22, 2010; $5,000 on May 17, 2010; $4,300 on May 18, 2010; $1,500 on August 27, 2010; $2,100 on November 24, 2010; $19,470 on December 2, 2010; $1,250 on February 22, 2011; $2,749.65 on April 26, 2011; $1,000 on July 1, 2011; $4,100 on August 26, 2011; $1,000 on September 6, 2011; $2,000 on September 19, 2011; $10,475 on November 3, 2011; $1,000 on November 4, 2011; $1,645 on November 8, 2011; and $1,819 on

Page 7 - Government's Sentencing Memorandum

day of his meeting with SSA in Astoria where he told them he had no other bank accounts other than his Bank of America account ) defendant withdrew more than $8,800.00 and closed the Wells Fargo account.

Similarly, any claim by defendant that the property in Pacific City is owned by his daughter is without merit, as a review of the bank records confirmed defendant did not pay her rent.[7]   And any claim by defendant that the property in Nepal is for the benefit of the IWCS or the Nepalese people is completely false based on defendant's clear intent to sell the property and leave the proceeds to his daughter and girlfriend.

### Sentence Recommendation

The parties agree that defendant's relevant conduct pursuant to U.S.S.G. §§ 2B1.1(a)(1) results in a base offense level of 14 based on the loss amount being $79.714.30.    The parties further agree that defendant is entitled to a two-level reduction for acceptance of responsibility resulting in a total offense level of 12, and a sentencing range of 10 - 16 months.

The decision to prosecute an 88 year-old man was not made lightly.   If defendant was younger, the government would likely pursue a sentence of incarceration because of defendant's lengthy criminal conduct, his prior concealments, his blatant false statements to SSA and the investigators, and his obstructive acts during the criminal investigation.   Because of defendant's age and other 3553 factors, the government requests a three-year term of probation with the special

---

December 21, 2011.
  [7] Defendant's 2012 journal contains an excerpt from an email string dated February 24, 2012, between defendant and his girlfriend wherein she tells him "You need to sell me your house – cheap."  Defendant responds " . . .we could do that.   Pay Rara what she put into it and give me a bit of money and I promise you, you'll get a bargain."   The girlfriend responds, "You can live it [sic] in it forever.   Just pay the electric bills and water.   I'll pay taxes and insurance."

Page 8 - Government's Sentencing Memorandum

conditions recommended in the pre-sentence report. The imposition of restitution is mandatory and should be ordered payable as follows:

**Amount: $59,063.15 (SSI benefits)**
Social Security Administration
Debt Management Section
Attn: Court Refund
PO Box 2861
Philadelphia, PA 19122

**Amount: $8,747.00 (SNAP benefits)**
Oregon Department of Human Services
Overpayment Recovery Unit
PO Box 14150
Salem, OR 97309

**Amount: $11,904.14 (Medicaid benefits**
Address will be provided at sentencing.

The government requests that the court direct that the funds previously paid by defendant and held in the U.S. Treasury Registry in case number 3:12-cr-556-KI, be applied towards defendant's restitution obligation in this case. If there is still a balance owing on the restitution at the time of sentencing, the government requests that defendant be ordered to make restitution payments of not less than $75 per month.

Dated this 27th day of November, 2013.

Respectfully submitted,

S. AMANDA MARSHALL
United States Attorney
District of Oregon

 /s/ *Helen L. Cooper*
HELEN L. COOPER
Special Assistant United States Attorney